**AMERICAN DIETAIDS COMPANY, INC. and U. S. Nutrition Products Corp., Plaintiffs,**

v.

**PLUS PRODUCTS, Defendant.**

**No. 71 Civ. 1646.**

United States District Court, S. D. New York.

March 11, 1976.

---

\* To the same effect, *U. S. ex rel. Castro v. Regan,* 525 F.2d 1157 (3rd Cir. 1975).

Breitenfeld & Levine, New York City, for plaintiffs; Alan H. Levine, New York City, of counsel.

Kenyon & Kenyon, Reilly, Carr & Chapin, New York City, for defendant; Arthur D. Gray, New York City, Beehler, Mockabee, Arant, Jagger & Bachand, Los Angeles, Cal., of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

The plaintiffs, American Dietaids Company, Inc. and its subsidiary U.S. Nutrition

Products Corp. (both are collectively referred to hereinafter as "American Dietaids") have sued for a declaratory judgment that (1) their trademarks do not infringe defendant Plus Products' trademark and (2) Plus Products is estopped by laches from asserting any trademark rights it may have in the word "plus." Plaintiff also seeks cancellation of defendant's "PLUS" trademark (Registration No. 789,307) from the Principal Register of the Patent and Trademark Office.

The defendant has counterclaimed alleging trademark infringement and unfair competition, as well as seeking cancellation of plaintiffs' trademark "ACEROLA PLUS" (Registration No. 862,624) from the Principal Register of the Patent and Trademark Office.

American Dietaids has been in business since 1937 selling dietary supplements (primarily vitamins and minerals) to health food jobbers who distribute the products to health food stores throughout the country.

The defendant, in business since 1939, began selling vitamins for human consumption in 1940 or 1941. Defendant under the style or trade name of Plus Products originally operated as a mail order business selling mostly to chiropractors. In 1954, defendant expanded its mail order business to consumers other than chiropractors. In 1960, defendant began distributing its products to health food stores directly and through jobbers. In 1968 the defendant, which had begun as a sole proprietorship and had later become a corporation, was sold. Shares in the corporation were first offered to the public in 1972.

The defendant's original trademark was a seal-type design using the words "QUALITY" and "PLUS" each superimposed over one axis of a plus symbol. In 1964 the seal design was changed to delete the word "QUALITY." It was the altered seal design which apparently formed the basis of defendant's December 30, 1963 application to register the trademark "PLUS" in the Patent and Trademark Office. The registration on the Principal Register was issued on May 11, 1965. (15 U.S.C. § 1052). In 1972 the seal-type design was dropped and a new design of the word "PLUS," with a plus symbol inside the loop of the "P" was adopted.

Originally, the defendant's labels generally bore the seal design at the top, a descriptive designation such as "Vitamin A" in the middle, and the defendant's name at the bottom. In 1954, the descriptive designation portion of defendant's labels began to appear as "Plus Formula _____," the blank being filled by a number indicating which product it was. From 1954 to 1970, the "PLUS" seal was occasionally used at the first word in the Formula designation, rather than using both the seal and the word "plus." From 1970 to 1972 all of the defendant's labels used this format.[1]

The plaintiff started using so-called "plus-suffix trademarks (trademarks including "plus" as a suffix) on three of its products in 1958 or slightly earlier. It added a fourth plus-suffix product in 1959. Nine additional plus-suffix trademarked products were introduced by plaintiff between 1960 and 1962.

On November 19, 1963, plaintiff's trademark "ACEROLA PLUS" (the product was introduced in 1960) was registered on the Supplemental Register of the Patent and Trademark Office (15 U.S.C. § 1091 *et seq.*). In 1965, plaintiff applied to register the trademark on the Principal Register (15 U.S.C. § 1052). In due course the trademark was published for opposition and the registration was eventually issued in 1968. Defendant has never applied to cancel the registration. (15 U.S.C. § 1064).

A new plus-suffixed product, "CAMU PLUS"[2] was introduced in 1967, and sever-

---

1. Two products which were introduced in 1966 by defendant and which are still sold today, are identified by the usual labels with the additional terms "YEAST PLUS" and "PROTEIN PLUS," respectively. These two names are very similar in style to the names of plaintiff's products as described below. However, there are no products in plaintiff's line which use these designations.

2. This trademark has apparently been registered on the Supplemental Register and is the subject of an opposition proceeding by defendant.

al others have been introduced from 1973 on.

At the time that plaintiff started to use its plus-suffix trademarks, it was unaware of the existence of Plus Products, the defendant. Milton Okin, the principal of plaintiff, first became aware of the defendant sometime during the early 1960's, when defendant's products began to be sold in retail health food stores. The defendant first became aware of plaintiff's ACEROLA PLUS tablets in 1963 or 1964.

On July 7, 1970, an attorney for the defendant wrote letters to plaintiff claiming that plaintiff's plus-suffix trademarks infringed defendant's "PLUS" trademark. Plaintiff denied infringement. Correspondence between the parties indicated that the defendant intended to press its claim. On April 13, 1971, American Dietaids commenced this action.

A threshold question is the validity of the defendant's trademark registration. The plaintiffs have asked me to cancel this registration on the grounds that defendant, in its December 30, 1963 application for registration, asserted a first use of the trademark PLUS in interstate commerce on or about January 1, 1941. The plaintiff argues that the "QUALITY PLUS" or "PLUS QUALITY" (as defendant would have it) seal was used until 1964 by which time most of plaintiffs' plus-suffixed products were already on the market. Even taking 1954, the year in which the "Plus Formula _____" label was adopted by defendant, as the first year in which defendant used "PLUS" alone as a trademark, plaintiff argues that defendant made a false representation to the Patent and Trademark Office.

■ However, plaintiff failed to put into evidence the file wrapper history of the "PLUS" registration by defendant. Defendant argues that such evidence would have revealed that defendants fully disclosed the nature of its 1941 use of "PLUS"

to the trademark examiner. I make no finding as to what such evidence would have shown; however, the failure of proof of a false representation by defendant defeats plaintiff's application for cancellation of defendant's trademark.[3]

■ However, the fact that a trademark registration application for part of a composite trademark claims as a date of first use the first use of the composite mark does not compel the conclusion that another's use of part of the composite mark constitutes a trademark infringement. It is undisputed that defendant began using "PLUS" as part of its trademark well before the plaintiff introduced its first plus-suffixed products. However, the principal of plaintiff testified, and I credit his testimony, that when plaintiff adopted its first plus-suffix trademarked products in 1958, or slightly earlier, it was unaware of the defendant or its products. This testimony is supported by the fact that defendant's products were not sold through retail health food stores until 1960. Thus, certain of plaintiff's plus-suffixed products were available in health food stores, the arena in which the parties compete directly, prior to the defendant's products.

Moreover, ACEROLA PLUS, a type of vitamin C tablet which was originated by plaintiff, was first sold in 1960. This product is plaintiff's biggest seller. The defendant did not produce an acerola tablet until about 1972. Likewise, CAMU PLUS, another vitamin C tablet, was originated by plaintiff. It was introduced in 1967 and is apparently the only product of its kind on the market.

All of these facts convince me that when the parties became direct competitors they had each already adopted trademarks which utilized the word "plus". There is no evidence of bad faith on plaintiff's part. In fact, at the time that plaintiff began to use the word "plus" in its trademarks, the defendant was still using its composite mark,

---

**3.** It is unnecessary to reach defendant's additional arguments that plaintiff has no standing to challenge the "PLUS" registration since it asserts inconsistently that there is no possibility of confusion between its products and those of the defendant.

had not yet registered "PLUS" with the Patent and Trademark Office, and was actually the newcomer to the retail health food store market.

It would further appear that the parties became aware of each other at roughly the same time in the early 1960's, with plaintiff's awareness probably preceding defendant's slightly. Thereafter, the defendant neither took any action against nor complained to plaintiff for approximately seven years.

Based upon these facts the plaintiff urges that laches estops defendant from asserting a claim of infringement. Clearly the defendant did delay for a long period of time (approximately seven years) in asserting the rights it now claims. The plaintiff adopted certain of its marks before it knew of defendant and thereafter was justified in relying on defendant's silence in continuing to sell, advertise, and expand its plus-suffixed line of products.

I also find that the injury to the plaintiff which enjoining its use of the plus-suffix trademarks would cause would be enormous and irreparable. The sales of its plus-suffixed products represent roughly ⅓ to ⅔ of plaintiff's total yearly sales (the figures fluctuate from year to year).

On the other hand, while the parties are in direct competition, I find that the harm to the defendant of plaintiff's use of its plus-suffix trademarks has not been proved. The defendant's sales have grown continuously. The defendant's net sales for 1973, the last year for which I have complete statistics, were approximately six times those of plaintiff. In contrast, the plaintiff's sales of its contested products represent over one-half of its total sales for the same year. Thus, to the extent that defendant might have lost any sales in 1973, the potential gain to defendant was minimal in comparison to the potential loss to plaintiff.

In fact, as discussed below, no actual confusion has been demonstrated nor is such confusion likely. Furthermore, the Patent Office Trademark Trial and Appeal Board found in denying defendant's opposition to the registration of "PROTEIN PLUS," a breakfast cereal produced by General Mills, Inc., "that in a trademark sense [PLUS] is a weak rather than inherently strong mark." *Plus Products v. General Mills, Inc.*, Opposition, No. 52,595, June 23, 1975 at 6.

In sum, I find that the plaintiff was justified in relying on defendant's silence which confirmed plaintiff's belief that the respective trademarks were not in conflict. Weighing the equities, I find the defendant is now estopped from asserting its claim. See *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900); *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 703–04 (2d Cir. 1970), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971); *Haviland & Co., Inc. v. Johann Haviland China Corp.*, 269 F.Supp. 928 (S.D.N.Y.1967).

The only defense raised by the defendant to the laches argument is one of unclean hands.[4] It is defendant's position that an equitable defense of laches may not be used by the plaintiff since it has misrepresented its product to the public. See *Precision Instrument Manuf. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1944); *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1941); *Worden & Co. v. California Fig Syrup Co.*, 187 U.S. 516, 23 S.Ct. 161, 47 L.Ed. 282 (1902).

At trial the defendant introduced some expert testimony as to the wholesale price and availability of natural vitamin C. The theory was that plaintiff's labels indicate that its products contain natural as opposed to synthetic vitamin C, whereas in reality

4. The allegation by defendant of bad faith on plaintiff's part is, as I have found it, unfounded. The argument that defendant has vigorously enforced its rights as to its trademark and tradename is belied by its own exhibit (R) which purports to list all its involvements in trademark opposition proceedings. The date of the earliest proceeding listed on that exhibit is 1/72.

the cost of the natural vitamin would preclude such a result. The plaintiff vigorously objected to this testimony on the grounds of surprise. Defendant had failed to give the plaintiff notice of its experts, as requested by an interrogatory asking the names of any experts defendant intended to produce at trial. Alternatively, the plaintiff requested a continuance to enable it to respond to the surprise testimony.

The motion for a continuance was denied and I reserved decision on plaintiff's motion to strike the expert testimony. Because this case was tried non-jury, the defendant was allowed great latitude in presenting its expert testimony.

Even with the latitude afforded it, the defendant did not sustain its burden of proof. The proof as to the cost of the natural vitamin was inconclusive since not all suppliers were canvassed. In fact, even to the extent that one of the defendant's expert witnesses did survey the wholesale market, his testimony was objected to as hearsay. While such testimony was admissible as a foundation for the expert's opinion on the economic feasibility of producing a natural tablet, it was not proper proof of the truth of the various prices. Moreover, it was totally unpersuasive.

The defendant placed great emphasis on plaintiff's failure to assay the vitamins from its suppliers to ascertain whether in fact they were natural. There was general agreement that the difference between synthetic and natural vitamin C was insignificant both chemically and healthwise. The only significance according to defendant is the advertising value of the natural vitamin which many health food consumers believe superior to the synthetic.

The plaintiff's principal testified that the plaintiff relied on protocols from its suppliers which represented the vitamins to be natural. There is nothing to indicate that this was improper. In fact, one of defendant's expert witnesses testified that in his own research on the effects of diet on animals he had relied on the guaranteed analysis of the food which his supplier certified.

Finally, there was the failure of the experts to analyze the plaintiff's products to determine whether, in fact, they contained natural or synthetic vitamin C. In view of the fact that various of plaintiff's products were weighed, tested for their vitamin potency, and found to accord with the statement on the labels, this oversight is quite astonishing.

The expert testimony was both an unfair surprise and, at best, inconclusive. Whether, if proved, the plaintiff's alleged mislabelling would have barred a laches defense need not be decided. The plaintiff in this case is not precluded from asserting its defense of laches.

Having found that defendant is estopped from asserting its claims, I need not reach the infringement question. However, because the public's interest is also at stake and because an examination of this issue will further clarify the equities involved, some analysis of the infringement question is warranted.

 There are conflicting arguments as to whether or not the various trademarks are confusing to the public, as the applicable test for infringement would require. See *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538 (2d Cir. 1956). Plaintiff's principal testified, and I find his testimony on this point compelling, that the health food buying public is quite sophisticated and able to distinguish between the products of the parties. Defendant counters with the argument that in registering "ACEROLA PLUS" on the Principal Trademark Register plaintiff was required to disclaim "ACEROLA," a generic term, leaving "PLUS" as the dominant, distinctive portion of the mark. According to defendant, this confuses the public.[5] However, the

---

5. While plaintiff's evidence of third party use of the word "plus" is inconclusive, the evidence is noteworthy both because of the sheer number of such products and because many of the products are in the food and dietary supplement lines.

disclaimer [6] in the registration proceeding did not eliminate "ACEROLA" from plaintiff's labels and it is the composite mark which has come to be identified with plaintiff's product.

Defendant further points out that plaintiff's registration of "ACEROLA PLUS" on the Principal Register was a § 2(f) registration. 15 U.S.C. § 1052(f). A § 2(f) registration is one in which the Commissioner of the Patent and Trademark Office requires proof of distinctiveness of a mark by its acquisition of a secondary meaning. On the other hand, the defendant was able to register "PLUS" without any proof of secondary meaning. Thus "PLUS" must have been construed by the Patent and Trademark Office to be either suggestive or arbitrary. See *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976).

Therefore, despite plaintiff's disclaimer of "ACEROLA," the only logical conclusion is that the Patent and Trademark Office understood the plaintiff to be registering something more than merely "PLUS" when it registered "ACEROLA PLUS" after requiring proof of its distinctiveness. Assuming, as defendant argues I must, that the Patent and Trademark Office did not find defendant's prior registration of "PLUS" (see *Henderson v. A. C. Spark Plug Div. of General Motors Corp.*, 366 F.2d 389, 393 (9th Cir. 1966)), the requirement of proof of distinctiveness indicates that it was the composite mark which was found to have become distinctive.

Defendants rely on a number of cases in which composite marks containing generic or descriptive terms as well as suggestive or arbitrary terms were held to overlap with registered marks containing the same suggestive or arbitrary words. See *W. E. Bas-*

*sett Co. v. Revlon, Inc.*, 435 F.2d 656 (2d Cir. 1970); *In re Freedom Oil Works Co.*, 77 F.2d 631, 22 CCPA, Patents, 1277 (1935); *Broderick v. L. Mitchell & Co.*, 53 App.D.C. 220, 289 F. 618 (1923). In these cases the courts either found infringement or denied registration of the overlapping trademark. The defendant argues that the same situation exists in this case. Moreover, it argues that since acerola as a source of vitamin C had received wide publicity in the press and since defendant's name was well known through references to it in the 1954 hardcover and 1960 softcover publications of Adelle Davis' *Let's Eat Right to Keep Fit*,[7] the plaintiff cashed in on a market that should have belonged to defendant.

Without making any finding as to the state of defendant's reputation in 1960, I do find that it was plaintiff which originated and first marketed the acerola tablet. Plaintiff expended considerable money advertising the product and creating a market for it. Plaintiff, which had long sold its products through health food stores, introduced the product simultaneously with defendant's entrance into the health food store market. Defendant did not introduce an acerola tablet for 12 years. Defendant's mark was not registered in 1960 when plaintiff introduced ACEROLA PLUS. Finally, plaintiff registered "ACEROLA PLUS" on the Supplemental Register prior to defendant's registering its mark on the Principal Register. While this fact may have little or no legal significance, it is probative of plaintiff's good faith belief that it had a right to the mark. All of these facts distinguish this case from those cited above.

Whether or not the marks were initially, superficially confusing and whether or not a composite mark combining a gener-

---

6. The actual wording of the disclaimer reads "no claim is made to the word 'Acerola' apart from the mark as shown." Acerola is a generic term which is, as a matter of law, incapable of acquiring independent trademark significance. However, the language of the disclaimer indicates that as used in plaintiff's trademark the word was accorded significance by the Patent

and Trademark Office as an integral part of a composite mark.

7. The book refers to defendant in several footnotes, generally including the defendant's address. The presence of the address in the footnotes may well have suggested to the public the original mail-order nature of defendant's business.

ic term and an already registered term could be said to have acquired a secondary meaning, so as to render them registrable under the Lanham Act (see *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,*), the plaintiff's trademarks have acquired a practical secondary meaning over the approximately eighteen years that plaintiff has used them. In sum, I find no significant likelihood of confusion [8] between plaintiff's and defendant's products among ordinary prudent purchasers. See *Maternally Yours, supra.*

As to the plaintiff's plus-suffixed products which have been introduced during the pendency of this action, the equitable defense of laches is not available. However, the new products (Rose Hips Plus, Super Acerola Plus, E-Cerola Plus, and D-Alpha Plus) all adopt the style of plaintiff's earlier marks. To the extent that they are designed to cash in on anyone's reputation, it is plaintiff's own reputation which is invoked. For example, among plaintiff's established product line are Rose Hips Vitamin C Plus and Acerola Plus. The identification of the new products with these earlier products and with plaintiff's whole plus-suffixed line, is necessarily far greater than with a product labelled Plus Formula _____.

For all of the above reasons the plaintiff will not be enjoined from the use of its trademarks. Both parties have also failed in their attempts to cancel the trademark registration of the other.

Settle judgment on notice.

---

**8.** It is also interesting that in *Plus Products v. General Mills, Inc., supra*, the Trademark Trial and Appeals Board while basing much of their opinion on the difference between the products of the parties went on to find that PROTEIN PLUS is no more similar to PLUS than PLUS is to MILK PLUS and FOOD PLUS, marks which were cited against Plus Products' application to register "PLUS."