**PLUS PRODUCTS,**
**Plaintiff-Appellee-Cross-Appellant,**

v.

**PLUS DISCOUNT FOODS, INC., and the Great Atlantic and Pacific Tea Company, Inc., Defendants-Appellants-Cross-Appellees.**

**Nos. 1436, 1512, 1513, Dockets 83–7238, 83–7292 and 83–7294.**

United States Court of Appeals, Second Circuit.

Argued June 17, 1983.

Decided Nov. 3, 1983.

---

James B. Swire and Robert L. Raskoff, New York City (Townley & Updike, New York City, on brief), for plaintiff-appellee-cross-appellant.

Robert M. Newbury and Mark V.B. Partridge, Chicago, Ill., and Henry G. Bisgaier, New York City (Pattishall, McAuliffe & Hofstetter, Chicago, Ill., and Cahill, Gordon & Reindel, New York City, on brief), for defendants-appellants-cross-appellees.

Before OAKES and CARDAMONE, Circuit Judges, and BARTELS, Senior District Judge.*

---

* Of the United States District Court for the Eastern District of New York, sitting by designation.

1. The judgment reads in pertinent part as follows:

 2. Defendants Plus Discount Foods, Inc. and The Great Atlantic & Pacific Tea Compa-

BARTELS, Senior District Judge:

We are again faced with litigation by two major corporations involving the issue of trademark infringement, the senior user seeking to prevent the use of marks employed by the junior user. Defendants Plus Discount Foods, Inc. ("Foods"), a chain of discount supermarkets, and its parent, The Great Atlantic and Pacific Tea Company, Inc. ("A & P"), appeal from a final judgment entered in the United States District Court for the Southern District of New York, 564 F.Supp. 984, (Robert W. Sweet, *District Judge*), enjoining them from using the trademark and trade name "PLUS" as its stores' name and as a label on its private label brands. The issue is presented by the plaintiff Plus Products ("Products"), a producer of certain vitamin and mineral food products, which complains that the use of the trademark "PLUS" by defendants is in violation of its federally registered trademark and constitutes unfair competition. Products cross appeals seeking a broader scope of the injunction against the use of Foods of the trademark and also from the district court's denial of costs.

After a three-day bench trial, the district court concluded there was a likelihood of confusion between the parties' products, and it enjoined Foods from using the PLUS logo upon its stores and also upon all brand name products sold by Products unless the word "FOODS" was added to Foods' logo in size and style equivalent to that of the word "PLUS." In addition, Foods was required to post a statement in a prominent location in its stores disclaiming any connection between Products and Foods and specifying that its private label products were not produced by Products. That disclaimer was also required to be included in any advertising material that referred to products of a character manufactured by Products.[1]

ny, Inc., jointly and severally, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them or any of them, be and they hereby are enjoined and restrained: (a) from using their PLUS logo, unless the word FOODS is added in size and style equivalent to the use of the word PLUS;

## FACTS

Products, a California corporation, founded in 1939, is in the business of producing and selling health products, and since its inception, it has continuously operated under the trade name PLUS. At the beginning Products simply sold vitamins, minerals and food fortifiers, but approximately twenty years ago it began expanding its PLUS line. In 1962 it added a variety of health and beauty aids under its PLUS mark, including skin creams, lotions and hair care products. In 1963 it introduced spices and cooking oil products, and in 1972 it added pet food supplements.[2] All of the products sold under the PLUS mark are known for their high quality and high price.

Initially Products sold its goods through mail order. However, in 1960 it changed its merchandising approach by selling directly to jobbers and health stores. Currently, the bulk of its sales is to such stores. In 1980 Products was acquired by Richardson-Vicks, Inc. ("RVI"), which established a new company policy of promoting distribution of the PLUS line into supermarket nutrition centers. Up until that time the PLUS line products were sold in nutrition centers in only three retail grocery chains, representing about forty stores. By the end of 1981, as a result of Products' new marketing approach, its products were sold in over thirty-five chains with 923 centers. In large part RVI was recognizing and responding to the increased interest in nutrition and natural products recently developed in this country which has led a significant number of supermarkets to open up nutrition centers within their retail stores. The health food sections, particularly popular on the west coast, are actually self-contained mini-health stores, for the premium-priced products therein are segregated from the grocery's more mundane items, thereby fostering the image of a high quality health food store within a retail supermarket. Products' dispute with Foods is a natural by-product of its expansion into conventional grocery stores.

Naturally, Products was vigilant in attempting to restrict others from using the word "PLUS" even before its entrance into conventional grocery store sales. It is the proprietor of three organizations for the trademark PLUS and one registration for the trademark PLUS ONE–UP,[3] and since 1970 it has forwarded cease and desist letters to companies relating to over 130 different uses of the word "PLUS," and has filed numerous opposition proceedings in the Patent and Trademark Office. *See, e.g., American Dietaids Co. v. Plus Products,* 412 F.Supp. 691 (S.D.N.Y.), aff'd, 551 F.2d 299 (2d Cir.1976) ("ACEROLA PLUS" and "CAMU PLUS"); *Plus Products v. Natural Organics, Inc.,* 204 U.S.P.Q. (BNA) 773 (T.T.A.B.1979) ("NATURE'S PLUS"); *Plus Products v. Redken Laboratories, Inc.,* 199 U.S.P.Q. (BNA) 111 (T.T.A.B.1978) ("ph PLUS").

(b) from using the designation PLUS FOODS or FOODS PLUS unless, in a prominent location, a statement is posted that disclaims any connection between Plus Products and Plus Discount Foods, Inc., which disclaimer shall also be placed in any advertising material that refers to products of a character manufactured by Plus Products, including shelf talkers used with such products;
(c) from using private labels on any products of a character manufactured by Plus Products unless the statement referred to in Paragraph 2(b) also includes a statement that such private label products are not produced by Plus Products.

2. In addition to sales under the PLUS line which accounts for about 75% of Products' total sales, for many years Products has also been selling a line of nutritional snacks under the mark TIGER'S MILK. This line includes cookies, nutrition bars, nutrition boosters, milk shakes, cheese and spaghetti sauce mixes, macaroni, spaghetti and TIGER tea, and it is distributed both to supermarket outlets and to health stores.

3. The registrations for the trademark PLUS are the following: No. 789,307, issued May 11, 1965, covers high protein vitamin products and mineral food fortifiers; No. 1,035,610, issued March 16, 1976, is for hand and body lotions, creams and oils; and No. 1,096,407, issued July 18, 1978, covers cosmetic cleansing and moisturizing creams, lotions and gels, skin toner, hair shampoo, toilet soap and dietary supplements. Registration No. 1,133,474, issued April 22, 1980, is the trademark PLUS ONE–UP for dietary supplements.

Defendant Foods, a chain of discount grocery stores, incorporated in New Jersey, is the latest company whose use of the word PLUS, Products is challenging. Foods has a markedly different public image from the high quality image of Products' PLUS line, its chain of discount stores offering consumers lower prices in exchange for an absence of amenities.[4] For instance, customers must select their merchandise from cartons and bins, they must pay by cash and must bag their own goods. Foods stocks national brands with which it utilizes shelf talkers bearing the PLUS mark, and it also has hundreds of private label items that are sold under its PLUS logo. Only a few of these items overlap with goods sold by Products, to wit, spices, food oils and pet foods.

This particular concept of "bargain basement" grocery stores was originated by a large German food retailer, the Tenglemann group. For several years Tenglemann had been successfully operating a chain of discount food stores in Germany under the name PLUS, which carries private label items also identified by the PLUS logo. Foods' logo features the word "PLUS" with a blue and orange border derived from the slogan "Priced Low-U Save," while the Products' logo also features the word "PLUS" but is in block letters with a plus symbol over a red dot inside of the loop of the "P." In January, 1979, Tenglemann purchased operating control of A & P, and after the takeover, A & P began investigating the possibility of beginning a PLUS line of discount stores in the United States. However, a trademark registration search revealed Products' registrations, and when Foods attempted to register PLUS for supermarket services, the U.S. Patent and Trademark Office examiner refused registration because of likely confusion with Products' registration. A & P retained the services of trademark counsel who advised against utilizing the PLUS logo on vitamins, shampoos, beauty preparations and

beauty soaps,[5] and subsequently A & P incorporated Foods as its wholly owned subsidiary, and decided to adopt PLUS as the trade name of its stores and trademark on its brand name items.

The trigger for the instant action was an article published by The Wall Street Journal on July 9, 1979, in which appeared an announcement of A & P's plans to open a chain of PLUS stores. The article was brought to the attention of Products' counsel who wrote to A & P on September 17, 1979, expressing concern that Foods' stores might be identified with Products. A & P responded by stating its position that there was no prospect of confusion. This litigation followed.

## DISCUSSION

As in all trademark and trade name infringement cases, the crucial issue is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); 3A Callman, The Law of Unfair Competition, Trademarks & Monopolies § 21.07 (4th ed. 1983) ("Callman"). The solution of this problem does not become easier with time and depends upon a consideration of the facts and circumstances in each case. *See McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979). The gravamen of plaintiff's complaint is chiefly directed to reverse confusion as to the source of its products. It is plaintiff's claim that consumers will perceive that Products' line of health products is associated with or emanates from Foods. If they conclude that defendant Foods is the source of Products' goods, Products' reputation for high quality merchandise may well become tarnished because of Foods' bargain basement,

---

4. Foods opened two discount stores in August, 1979. By the end of September, 1980, there were 61 and at the beginning of 1981 a maximum number of 81. Currently there are 38 in operation.

5. The remainder of the advice was shielded at trial by the attorney-client privilege.

no-frills image. *See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1371–72 (10th Cir.1977), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978); Callman at § 21.09.

There are a few added wrinkles to this case. The parties are not competitors in the usual sense. Products manufactures goods, some of which are sold in retail grocery stores while Foods is a retailer that carries some goods under its own brand name. Moreover, with the exception of spices, pet food and oils, the products involved are related but non-competing. It is clear, however, that related but non-competing products can become associated in consumers' minds, *Lever Bros. v. American Bakeries Co.,* 693 F.2d 251, 253 (2d Cir. 1982); *S.C. Johnson & Son v. Johnson,* 175 F.2d 176, 179–80 (2d Cir.), *cert. denied,* 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949); Callman at § 20.02, and that the functional differences between the products of the parties is immaterial if confusion as to the source of the goods is evident. *See, e.g., Continental Motors Corp. v. Continental Aviation Corp.,* 375 F.2d 857 (5th Cir.1967); *National Trailways Bus System v. Trailway Van Lines,* 269 F.Supp. 352 (E.D.N.Y.1965); *Albany Packing Co. v. Crispo,* 227 App.Div. 591, 237 N.Y.S. 614 (1929), *aff'd,* 253 N.Y. 607, 171 N.E. 803 (1930).

 In determining likelihood of confusion between Products' and Foods' non-competing products, the appropriate analysis is to consider and balance the factors enumerated in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).[6] In its decision the district court applied the classic formula of *Polaroid Corp. v. Polarad Electronics Corp.,* which we repeat here:

> Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account.

*Id.* at 495 (citing Restatement of Torts §§ 729, 730 & 731). *Accord, McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d at 1130; *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d at 47; *Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1169 (2d Cir.1976); *Triumph Hosiery Mills, Inc. v. Triumph Internat'l Corp.,* 308 F.2d 196, 198 (2d Cir.1962). No single *Polaroid* factor is determinative. Rather each must be considered in the context of all of the other factors, and from a balance of these determinations, one is able to reach the ultimate conclusion, whether there is likelihood of confusion between the two parties' products. *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 965–66 (2d Cir.1981); *Lever Bros. v. American Bakeries Co.,* 693 F.2d at 253; *American Home Products Corp. v. Johnson Chemical Co.,* 589 F.2d 103 (2d Cir.1978); *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 1099 (2d Cir.1969), *cert. denied,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970); *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531 (2d Cir.1964).

 On review it is the function of the appellate court "to be sure the District Court applied the correct legal standards and correct criteria to findings that are not clearly erroneous." *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d at 968. More specifically, the district court's determination of each of the *Polaroid* factors is a finding of fact to which the clearly erroneous standard is applicable. The court's use of those factors, though, and its determination of likelihood of confusion based on the balancing of or

---

**6.** In this case both competing and non-competing goods, as well as "reverse confusion," concerning the source of the goods, are involved. As we pointed out in *American Int'l Group, Inc. v. London American Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981), the *Polaroid* analysis has been extended to competing as well as non-competing goods. Except for three items, however, the parties' products are related but non-competing.

relative weight given to each of its findings is a legal conclusion which is reviewable by this court as a matter of law. *Lever Bros. v. American Bakeries Co.,* 693 F.2d at 255; *Alpha Industries, Inc. v. Alpha Steel Tube and Shapes, Inc.,* 616 F.2d 440, 443–44 (9th Cir.1980); *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d at 1139. *See generally,* 5A J. Moore & J. Lucas, Moore's Federal Practice ¶ 52.03[1] (2d ed. 1982). *But see Sun Banks of Florida v. Sun Federal Savings & Loan,* 651 F.2d 311, 314 (5th Cir. 1981). The district court comprehensively set out and scrutinized each of the *Polaroid* factors, and we find that none of the factual findings it made is clearly erroneous. However, we do find that the court's balancing of the *Polaroid* factors was incorrect. The weight the district court allocated to the above factors shows that confusion between Products' merchandise, on the one hand, and Foods' store name and non-overlapping goods, on the other, is unlikely.

To determine the likelihood of confusion, we evaluate the weight of the following *Polaroid* factors:

### (1) *Strength of the Mark*

■ The distinctiveness of a trademark determines its relative strength or weakness. In other words, the "strength" of a mark denotes "its tendency to identify the goods sold under the mark as emanating from a particular ... source." *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d at 1131. To assess the strength of a mark, trademarks are generally categorized, in ascending degree of distinctiveness, as generic, descriptive, suggestive or arbitrary. Although this classification system is a helpful tool in conceptualizing this somewhat amorphous subject, it is not determinative, for the strength of a mark "depends ultimately on its distinctiveness or its 'origin-indicating' quality in the eyes of the purchasing public." *Id.; see also Lever Bros. v. American Bakeries Co.,* 693 F.2d at 256.

The district court characterized PLUS as suggestive and concluded that it was a weak mark. It premised its finding of weakness on the lack of originality and uniqueness of the word "PLUS," extensive third-party use, and several opposition proceedings in which the U.S. Patent and Trademark Office Trademark Trial and Appeal Board ("T.T.A.B.") held that the PLUS trademark was weak. In *Plus Products v. Redken Laboratories, Inc.,* 199 U.S.P.Q. at 116, the T.T.A.B. expressly found Products' PLUS mark to be weak and stated that the effect of that weakness limits the scope of protection of those marks to "the substantially identical designation and/or to the subsequent use thereof on substantially similar goods." *See also Plus Products v. Medical Modalities Ass'n,* 211 U.S.P.Q. (BNA) 1199, 1207 (T.T.A.B.1982); *Plus Products v. General Mills, Inc.,* 188 U.S.P.Q. (BNA), 520, 522 (T.T.A.B.1975), *aff'd,* 534 F.2d 336 (Cust. & Pat.App.1976).

■ This finding of trademark weakness is unquestionably accurate. The term PLUS is an everyday word that indicates something added, and when applied to goods, it merely implies additional quantity or quality. As shown by Products' cease and desist correspondence, third-party use of the word PLUS is extensive. Since 1970 Products has discovered over 130 different uses of marks that include the word PLUS, suggesting a generic character. One of the companies to which Products forwarded a cease and desist letter, the American Dietaids Company, Inc., filed a declaratory judgment action against Products. The court held, *inter alia,* that the PLUS mark was weak and that there was no likelihood of confusion between Products' mark and "ACEROLA PLUS" and "CAMU PLUS" which Dietaids was utilizing in connection with vitamin supplements. *American Dietaids Co. v. Plus Products,* 412 F.Supp. at 697–98. Even Products has tacitly acknowledged the weakness of the PLUS mark. In 1977, it filed a statement with the Securities and Exchange Commission in which it voiced its conclusion that trademark protection costs were no longer beneficial to it because of unfavorable lawsuit judgments. Moreover, research conducted for Products and RVI indicates that among sophisticated health food shoppers, awareness of the PLUS brand name is low.

While holding correctly that the PLUS mark was weak, the district court drastically underestimated the effect of its finding, concluding only that the factor of weakness "weighs slightly against Products." It is clear that the weaker the mark the less likely it is that consumers will view it as an indication of origin. *Lever Bros. v. American Bakeries Co.*, 693 F.2d at 256; *Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan*, 651 F.2d at 315–16; *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d at 1131. When a mark is as weak as that of Products' PLUS—comprised of an undistinctive word and coexisting with extensive third-party usage—it is extremely unlikely that prudent consumers will confuse it with similar marks on non-competitive goods. *See Lever Bros. v. American Bakeries Co.*, 693 F.2d at 256; *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F.Supp. 1341 (E.D.Pa.1972), *aff'd*, 480 F.2d 917 (3d Cir.1973); *Plus Products v. Redken Laboratories, Inc.*, 199 U.S.P.Q. at 116; Lunsford, "Trademark Basics," 59 Trademark Reporter 873, 878 (1969). As is noted in Callman § 20.43 at 262 (footnotes omitted):

> If a mark is weak, its protection may have an "extremely narrow scope," [*Keebler Weyl Baking Co. v. J.S. Ivins' Son*, 7 F.Supp. 211, 213 (E.D.Pa.1934)] and may even be limited to similar goods similarly marketed...
>
> ... "One who devises a new, strange, 'catching' word to describe his wares may and often has by timely suit prevented others from taking his word or set of words to gild the repute of even wholly different goods ... but one who takes a phrase which is the commonplace of self-praise like 'Blue Ribbon' or 'Gold Medal' must be content with that special field which he labels with so undistinctive a name." [*France Milling Co. v. Washburn Crosby Co.*, 7 F.2d 304, 306 (2d Cir.1925)].

We do not suggest that a product with a weak mark will never be accorded protection against non-competing goods. We do conclude, however, that the scope of protection accorded a weak mark, like PLUS which is little more than self praise, will be confined to competing products unless a convincing combination of other *Polaroid* factors militates strongly in favor of likelihood of confusion. As later indicated, the other findings in this case do not represent such a combination.

### (2) *Actual Confusion*

■ Despite three years of concurrent use, the district court found there were no instances of actual consumer confusion, but it did not articulate the importance it gave to this factor. While we recognize that it is difficult to establish actual confusion on the part of retail customers, *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir.1970), no evidence of confusion for over a three-year period, during which substantial sales occurred,[7] is a strong indicator that the likelihood of confusion is minimal. *Lever Bros. v. American Bakeries Co.*, 693 F.2d at 257; *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482 (1st Cir.1981); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d at 263; *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d at 1136.

### (3) *Quality of the Product*

■ It is correct, as found by the district court, that Foods' image as a "discount no-frills purveyor may create an image in the minds of some that Foods' offerings are of lower quality," but the district court's conclusion that this factor "weighs slightly in Products' favor" does not follow. Actually, the marked difference between the quality of plaintiff's and defendants' non-competing goods reduces rather than increases the likelihood of confusion. Products targets its high quality products at a special group of consumers who shop for foods and food supplements which are made

7. From 1970 to 1979 Products expended in excess of $6 million in advertising and promoting goods under the PLUS name and had sales of approximately $75 million under the PLUS mark. Foods has had over $400 million in sales and has spent over $5 million in advertising.

of natural ingredients and are known for their high nutritional value. It emphasizes the healthfulness of its merchandise in its advertising, which is placed primarily in health food publications, and its marketing technique in supermarkets is very discriminating, requiring isolation of Products' goods within nutrition centers. In sharp contrast, Foods' primary appeal is to cost-conscious shoppers looking for garden-variety grocery items which are sold at bargain-basement prices. Accordingly, the dissimilarity between the goods as well as between the groups of consumers that each party targets substantially lessens the likelihood of consumers' misapprehending the source of either type of products. *Vitarroz Corp. v. Borden, Inc.,* 664 F.2d at 967; *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d at 262.

### (4) *Sophistication of Buyers*

■ The court found that "the buyer of vitamins and health foods is likely to be somewhat discriminating and sophisticated and is therefore unlikely to confuse Products' image with Foods'," but it nevertheless concluded that this fact was unhelpful in determining likelihood of confusion because the distinction between health foods and grocery products is beginning to blur and the health food industry is penetrating "the buying habits of the general public." We believe that, given the presence of two products with such contrasting images and different marketing styles, the sophistication of Products' customers is entitled to some weight. In its weighing process of the *Polaroid* factors, the district court over-emphasized the significance of the proximity in the market of the parties' products to each other and the likelihood of Products' bridging the gap. The inflated weight it gave these factors seems to have decreased the weight it accorded the sophistication of Products' customers. We do not agree with this evaluation. Even though there is some blurring between high quality "natural" grocery items and health food products and even though Products is currently selling products in supermarket nutrition centers, sophisticated consumers may still be expected to exercise greater care than most other

shoppers. *See Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d at 489. Accordingly, buyer sophistication is an important consideration to weigh in evaluating likelihood of confusion. Under the circumstances, it seems likely that sophisticated buyers will not be confused in distinguishing Products' top-of-the-line merchandise from Foods' discount stores and the low-cost brand-name goods sold therein.

### (5) *Good Faith*

■ The court found that Foods had a prior interest, economic and historical, in the use of the word "PLUS" in its special type of food retailing. Accordingly, it correctly found that there was no bad faith on the part of Foods in using the mark—a factor to be weighed in determining injunctive relief.

### (6) *Similarity of the Marks*

Both Products and Foods feature the word PLUS in similar script with logos of different designs. The district court concluded that the differences in the logos were not enough to dispel an overall impression of similarity. Having examined the logos, we agree that the similarity of the marks weighs slightly in Products' favor, *see Miss Universe, Inc. v. Patricelli,* 408 F.2d 506, 509 (2d Cir.1969), but certain variables, not mentioned by the district court, minimize the importance of this finding. For instance, Foods uses the word "PLUS" in its labels as an acronym for "Priced Low-U Save" which is also featured in Foods' logo and which reduces the similarity of the logos. Again, the overall packaging context of the two parties' goods is significantly different. *See Lever Bros. v. American Bakeries Co.,* 693 F.2d at 257. The nutrition centers at which Products' goods appear are clearly set apart from other grocery products, and no such segregated center has been set up in any of Foods' stores. While the similarity of the marks presents a possibility of confusion, in the context of the marketplace, that possibility is only slight.

### (7) *Proximity of the Products*

The finding of the district court that the goods of Foods and Products are proximate was accurate. Its rationale was that given the diversification and mass merchandizing of today's market, consumers are likely to connect two complementary products with the same source, particularly in light of the fact that supermarkets frequently sell such items as vitamins, minerals and food supplements. In its balance of the *Polaroid* factors and its conclusion that there was likelihood of confusion, the court found the proximity of goods to be of prime importance. This conclusion is difficult to understand considering the court's further conclusion that "the proximity of the products is such that there is a danger that consumers will believe that the products in question have a common source, *although the danger is slight given the different modes in which the parties' merchandise is sold.*" (Emphasis added).

▮▮▮ We agree that similarities in the nature of the goods, given modern diversification, and proximity in the marketplace present a *slight* danger. However, the degree of proximity between the two products in the food sections of retail stores is relevant only insofar as it bears on the likelihood of confusion and gives the impression that non-competing goods are from the same origin, *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d at 1134, and a slight degree of proximity lends little credence to a conclusion that consumers are likely to be confused. The isolation of Products' line in supermarkets, its non-appearance in Foods' stores, the marketing differences of the two parties' goods and their separate groups of customers are important countervailing indicators. In *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d at 967, in finding no likelihood of confusion between use of the same mark for crackers and corn chips in the same retail outlets, this court stated:

> [T]his factor is not of overriding importance. Within retail food stores, the record shows that the products are shelved in different sections whenever space permits, the crackers in the "cookies and crackers" section, and the chips in the section for "salty, crunchy snacks." More

important, the record shows that Vitarroz targets its products at a distinct group of consumers, who shop for the Vitarroz name in specialty stores, many of which do not carry Borden's chips.

*Buitoni Foods Corp. v. Gio. Buton & C.S. P.A.,* 680 F.2d 290, 292 (2d Cir.1982), also held that there was no likelihood of confusion between table wine and liqueurs that have only slight proximity because of different alcohol contents and uses. The differences in modes of marketing and the segregation of Products' merchandise renders the slight proximity of the parties' products insignificant. The weakness of the PLUS mark further assures lack of confusion between the products of the parties. Moreover, as we said in *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d at 966, "[i]n no case, however, have we determined a senior user's right to injunctive relief solely on the basis of the similarity of the marks and the proximity of the products."

### (8) *Bridging the Gap*

Noting that RVI is an aggressive merchandizer and that health food products are ill-defined, the district court predicted that Products may well bridge the gap into "what might be considered conventional food products." While this prognostication is open to question because of Products' strict policy of confining its sales to health stores and nutrition centers, it is not clearly erroneous. Nevertheless, the specter of some blurring in distinction between health foods and conventional food items is outweighed by other factors. Foods runs a particular type of grocery, a discount store carrying brand-name items, and given the other *Polaroid* factors, we do not agree that the possibility that Products may sell conventional foods—in all probability high-priced items—will result in confusion in the source of the two parties' goods.

In view of our conclusion concerning the weight to be given the various *Polaroid* factors, we find no reason to extend the injunction to the parties' non-competing goods. Accordingly, the injunction should be limited to the three overlapping goods above mentioned—pet foods, spices and

food oils. Further, the disclaimers proposed by the district court and the addition of the word "FOODS" to the logo of the appellant are unnecessary. Finally, we conclude that the denial of costs was proper.

Judgment affirmed in part and reversed in part and remanded with instructions to grant relief in accordance with this opinion.