**SMITHKLINE BECKMAN CORPORATION and Menley & James Laboratories Ltd., Plaintiffs,**

v.

**The PROCTOR & GAMBLE COMPANY, The Proctor & Gamble Distributing Company, and Norwich Eaton Pharmaceuticals, Inc., Defendants.**

No. 84–CV–656.

United States District Court, N.D. New York.

July 26, 1984.

As Amended Aug. 2, 1984.

MacKenzie, Smith, Lewis, Michell & Hughes, Nancy L. Pontius, Syracuse, N.Y., Finnegan Henderson Farabow Garrett & Dunner, Laurence R. Hefter, Charles E. Lipsey, Susan H. Griffen, Washington, D.C., for plaintiffs.

Smithkline Beckman Corporation, James R. Meyer, C.A. Karnavas, Philadelphia, Pa., Hancock & Estabrook, Donald J. Kemple, Syracuse, N.Y., Townley & Updike, Marie V. Driscoll, New York City, Dinsmore & Shohl, Thomas S. Calder, Lynda E. Roesch, The Proctor & Gamble Company, John J. Cummins, Cincinnati, Ohio, for defendants.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

In this action for trademark infringement and unfair competition, plaintiffs, manufacturers of the over-the-counter drug ECOTRIN, seek to enjoin defendants, manufacturers of a new over-the-counter drug called ENCAPRIN, from using the name ENCAPRIN on their encapsulated aspirin product. The matter was originally before the Court on a motion for a preliminary injunction. With the consent of the parties, the Court ordered the trial of the action on the merits advanced and consolidated with the evidentiary hearing on the preliminary injunction pursuant to Fed.R. Civ.P. 65(a)(2). A hearing was held on June 21, 22, 25, 27, and 28, 1984. This decision may be considered the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). For the reasons set forth below, the Court finds that the plaintiffs are not entitled to an injunction.

## JURISDICTION

This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1332, 1338 and 15 U.S.C. § 1121. In personam jurisdiction is present as all of the parties do business in this district with the exception of the Proctor & Gamble Company, an Ohio corporation, which has consented to the jurisdiction of the Court.

## BACKGROUND

Plaintiff Smithkline Beckman Corporation ("Smithkline") is a Pennsylvania corpo-

ration with its principal place of business in Philadelphia, Pennsylvania. Plaintiff Menley & James Laboratories, Ltd. ("Menley & James") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Menley & James is a wholly-owned subsidiary of Smithkline. Smithkline and Menley & James are engaged in the development, manufacture, and marketing of pharmaceutical products and are the makers of the over-the-counter drug ECOTRIN. Defendants The Proctor & Gamble Company ("P & G") and The Proctor & Gamble Distributing Company ("P & G Distributing") are Ohio corporations with their principal place of business in Cincinnati, Ohio. Defendant Norwich Eaton Pharmaceuticals, Inc. ("Norwich") is an Ohio corporation with its principal place of business in Norwich, New York. Norwich and P & G Distributing are wholly-owned subsidiaries of P & G. P & G and P & G Distributing are engaged in the development, manufacture, marketing, and distribution of consumer products, including over-the-counter pharmaceuticals. Norwich is engaged in the development and manufacture of pharmaceutical products. Defendants collectively are the makers and purveyors of a new over-the-counter drug called ENCAPRIN.

Smithkline is the owner of the registered trademark ECOTRIN which it uses on its enteric coated aspirin product.[1] The ECOTRIN trademark was registered on October 5, 1954 and has been in continuous use since that date. The enteric coating on ECOTRIN allows it to pass through the stomach into the small intestine before dissolving. As the drug does not dissolve in the stomach, the upset stomach that sometimes accompanies the ingestion of aspirin is eliminated. ECOTRIN is designed to appeal to those consumers who need a stomach-safe aspirin.[2]

Until recently ECOTRIN was promoted principally to physicians for recommendation to their patients. In 1982 Smithkline began to advertise ECOTRIN directly to the consumer via national television and print advertising. ECOTRIN sales have risen dramatically since Smithkline began national advertising: ECOTRIN sales to date total more than $93 million with $24.4 million in sales for 1983 alone.

In 1982 P & G acquired Norwich. The defendants planned to manufacture a capsule that contained enteric coated aspirin micrograins. P & G initially considered five names for its encapsulated aspirin product: NORWICH, MICRONAL, ARTHREX, ASSURE, and ENCAPTIN. Of these names, ENCAPTIN was shown by market research to be the best choice for use on a stomach-safe aspirin product. The ENCAPTIN name was thereafter altered slightly to ENCAPRIN as P & G believed that the "RIN" suffix would more clearly indicate to consumers that this was an aspirin product.

Thereafter, P & G directed its legal department to conduct a trademark search of existing trademarks to determine the availability of the ENCAPRIN and ENCAPTIN marks. Two searches were conducted in early 1983, neither of which disclosed the ECOTRIN mark although the searches did disclose other marks used on or registered for pharmaceutical products.

On March 14, 1983, P & G filed an application with the United States Patent and Trademark Office to obtain a federal trademark registration for ENCAPRIN. Applications for federal registration were also filed for the marks ENCAPTIN, MICRONAL, and MICRONEL. These four marks were published in the September, 1983 issue of Trademark Alert, a publication distributed by the Pharmaceutical Manufacturers' Association ("PMA") to its members to keep them apprised of new marks filed with the Trademark Office. Although Smithkline, as a member of PMA, received a copy of the September Trademark Alert, it made no inquiry or protest to P & G or Norwich regarding the ENCAPRIN or ENCAPTIN marks.

---

**1.** The United States Trademark Registration Number for ECOTRIN is 596,306.

**2.** The majority of consumers who use enteric coated aspirin are arthritic.

The applications were examined by the Trademark Examiner and accepted in due course. Thereafter, on February 28, 1984, the marks were published in the Official Gazette.[3] Publication in the Gazette gives notice; third parties who believe they would be damaged by registration of the marks have thirty days in which to oppose registration.[4] No notices of opposition were filed before the end of the opposition period and the registration for each of the four marks issued on May 22, 1984.

3. The Official Gazette is issued weekly by the United States Patent and Trademark Office and contains a list of marks published for opposition. 15 U.S.C. § 1062(a).

4. A verified notice of opposition must be on file with the United States Patent and Trademark Office within 30 days of the date of publication in the Official Gazette. 15 U.S.C. § 1063.

5. Smithkline's letter to P & G stated:

It has just come to our attention that you have begun to market an aspirin product under the trademark ENCAPRIN. It is our understanding that this product contains coated aspirin granules in a capsule; and is advertised to release the active ingredient in the small intestine rather than in the stomach. It is obvious that this product has been developed to compete directly with ECOTRIN coated aspirin tablets and capsules, one of Menley & James' most important products.

Menley & James Laboratories Ltd. is a wholly-owned subsidiary of SmithKline Beckman Corporation, the owner of the registered trademark, ECOTRIN (Reg. No. 596,306 renewed October 5, 1974).

We are extremely concerned over the potential for confusion between ECOTRIN coated aspirin and your ENCAPRIN product. The products compete head-on in the marketplace and the trademarks themselves have strong similarities in appearance and pronunciation.

As a newcomer competing against a well known and established brand, you have a legal obligation to select a trademark which does not take unfair advantage of the substantial reputation that we have created. It is no help to claim that you have combined elements of generic words which, if they were used by themselves, would not be objectionable. The end result is the same. Consumers will have difficulty in distinguishing your product from ours by relying on the trademark and confusion will be likely. As a company that is one of the premier marketers of trademarked goods, I am sure you can appreciate our concern. To avoid the potential for confusion, we request that you abandon this trademark immediately and select an alternate for this product.

P & G first sold the ENCAPRIN product in its lead market in Tucson, Arizona beginning in January, 1984. Soon thereafter, the ENCAPRIN product came to the attention of Smithkline, and in April, 1984, Smithkline sent P & G a letter protesting continued use of the ENCAPRIN mark.[5] P & G rejected Smithkline's protest by letter dated April 17, 1984 and proceeded with the national launch of the ENCAPRIN product in early May, 1984.[6] The product was thereafter presented to at least one

We note, that you have also applied to register ENCAPTIN. We would be equally concerned about the adoption of this trademark for your product.

The letter was signed by Mr. James R. Meyer, Smithkline's Trademark Counsel.

6. P & G's response to Smithkline stated:

This is in response to your April 2 letter ... requesting that we abandon our ENCAPRIN trademark and select an alternative name other than ENCAPTIN for our product.

The comments in that letter and those made by you and your outside counsel ... in subsequent phone conversations have been carefully considered, but we see absolutely no basis for the position that the subject marks have strong similarities in appearance and pronunciation. To the contrary, the seven letter ECOTRIN and the eight letter ENCAPRIN are clearly different words with different initial sounds, stress patterns and primary and secondary accents (EK–O–TRIN versus N–CAP–RIN).

You did not specifically say so in your letter but did admit in our April 9 phone conversation that it is your contention that any mark used on a pain reliever is in conflict with ECOTRIN if it contains what you called the "elements" of your mark—three syllables beginning with the letter "E" and ending with the letters "RIN" (in fact, ending with "IN," since you also consider ENCAPTIN and two [other] brands ... ENTRACIN and ENTERACIN, to be objectionable). If this were true, of course, Bristol-Myers' EXCEDRIN and Burroughs Wellcome's EMPIRIN could not coexist in the marketplace with your product. You admitted in that conversation that you had not previously appreciated the fact that these two well-known brands of pain relievers also contain these same three elements. You also said that your company did not oppose our application to register ENCAPRIN for "analgesic" because the mark was not considered to be similar to ECOTRIN in that context. I realize [your outside counsel] attempted to circumvent these admissions by maintaining that our respective products are in what he calls a "very clear submarket" of pain relievers or analgesics but do not find that argument to be at all persuasive.

thousand physicians, to the American Rheumatology Association convention and to numerous retail drug chains, mass merchandisers, hospitals, pharmacists, and other health care professionals throughout the country. P & G's national television advertising for ENCAPRIN was scheduled to begin on July 15, 1984. P & G currently has approximately $12 million worth of finished goods imprinted with the ENCAPRIN name and the drug is now nationally available.

> Both you and [your outside counsel] made mention of your company's very large investment in its ECOTRIN brand and gave the impression that you believe we are not thoroughly committed to our name and do not have any significant investment in it because we are only in test market. To the contrary, our investment is substantial, as I pointed out, and we intend to defend it fully.
> You stated in your letter that our company is a premier marketer of trademarked goods, and we appreciate the compliment. As I mentioned to you ... we have achieved this recognition because of the ability of our brands to stand on their own, separately and distinctly, and we are convinced that ENCAPRIN does so also. In fact, it would not be in our interest to have it otherwise.
> Accordingly, and as we do not believe that consumers will experience difficulty in distinguishing our respective products, we are unwilling to comply with your request.
> The letter was signed by Mr. John J. Cummins, P & G's trademark counsel.

7. 15 U.S.C. § 1125 reads in pertinent part:
> (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

8. 15 U.S.C. § 1114 reads in pertinent part:
> (1) Any person who shall, without the consent of the registrant—

The present action was filed on May 10, 1984. Plaintiffs' allegations are contained in five counts: Count I alleges unfair competition under New York State common law; Count II alleges false designation of origin under the Lanham Trademark Act, 15 U.S.C. § 1125 [7]; Count III alleges trademark infringement under 15 U.S.C. § 1114 [8]; Count IV seeks cancellation of the ENCAPRIN and ENCAPTIN federal trademark registrations under 15 U.S.C. §§ 1064 and 1119 [9]; and Count V alleges dilution of the distinctive quality of a trade-

> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
> shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

9. 15 U.S.C. § 1064 reads in pertinent part:
> A verified petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed by any person who believes that he is or will be damaged by the registration of a mark on the principal register established by this Act.
> Section 1064 provides for cancellation proceedings before the Patent Office and, therefore, is not applicable here.
> 15 U.S.C. § 1119 reads in pertinent part:
> In any action involving a registered mark the court may determine the right to registration, order the cancellation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Commissioner, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

mark under the New York General Business Law § 368–d.[10]

## DISCUSSION

As noted previously, plaintiffs originally sought a preliminary injunction enjoining the defendants from using the trademark ENCAPRIN. Based upon the Court's order that the trial on the merits be advanced and consolidated with the hearing of the application for preliminary relief, plaintiffs now seek a permanent injunction. In deciding whether or not to grant injunctive relief, the Court must first determine whether the plaintiffs have prevailed on the merits. If the plaintiffs have demonstrated success on the merits, the Court must then decide whether the balance of equities favors injunctive relief; and if so, what form it should take. *Sierra Club v. Alexander*, 484 F.Supp. 455, 471 (N.D.N.Y.), *aff'd*, 633 F.2d 206 (2d Cir.1980); *Galella v. Onassis*, 353 F.Supp. 196, 235 (S.D.N.Y.1972), *aff'd in part and rev'd in part on other grounds*, 487 F.2d 986 (2d Cir. 1973).

### I. *The Merits*

To prevail on their claims of unfair competition and trademark infringement, the plaintiffs must prove by a preponderance of the credible evidence that "there is [a] likelihood that an appreciable number of ordinary prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question." *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1003 (2d

Cir.1983) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). In determining whether a likelihood of confusion exists, the Court must not consider whether it would be confused, but whether the ordinary buyer in the marketplace would be confused. This standard is easy to articulate, but difficult to apply. Each case must turn on its own facts; the citation of precedent on the issue of likelihood of confusion can only suggest a general pattern.

In determining whether a likelihood of confusion exists, a Court may consider a number of factors including (1) the strength of the senior manufacturer's mark; (2) the degree of similarity between the two marks; (3) the degree of similarity between the products; (4) evidence of actual confusion; (5) the junior manufacturer's good faith in adopting its own mark; (6) the quality of the defendant's product; (7) the sophistication of the buyers; and (8) the senior user's delay in asserting its claim of trademark infringement. *See Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).[11] *See also McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d at 47; *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir.1976). Each of these factors must be considered and balanced against the other factors; no single factor is determinative. *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d at 1004. In

---

**10.** New York General Business Law § 368–d reads in pertinent part:
Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

**11.** The *Polaroid* factors were originally applied only to noncompeting products. In *Vitarroz v. Borden, Inc.*, 644 F.2d 960 (2d Cir.1981) the Second Circuit held that the *Polaroid* analysis

could be applied to competing as well as noncompeting goods. The plaintiffs here have urged this Court to apply the *Polaroid* factors and the Court finds that such an analysis is proper despite the proximity of the two products at issue here. As the Court in *Vitarroz* stated:

In no case ... have we determined a senior user's right to injunctive relief solely on the basis of the similarity of the marks and the proximity of the products.

*Vitarroz*, 644 F.2d at 966. *See also American Int'l Group, Inc. v. London Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981).

evaluating these factors, the Court must be ever mindful that its task is to determine whether the ordinary buyer would be confused when presented with the products in the marketplace.

### (1) *Strength of the Mark ECOTRIN*

■ The strength of a trademark depends in large part on how distinctive it is; the more distinctive the mark, the greater the protection afforded to it. *McGregor-Doniger, Inc. v. Drizzle*, 599 F.2d at 1131.

■ In gauging the distinctiveness of a mark, it is necessary to examine the four categories into which marks are classified. In ascending order of strength, these categories are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Id.* While it appears that these categories are separate and distinct, considerable subjectivity is involved in determining which category a mark should fall into. The relationship between the category the mark is placed in and the ability to register that mark as a trademark was outlined by the Second Circuit in *McGregor-Doniger:*

> A generic term can never become a valid trademark and cannot be registered. A descriptive term can be registered as a mark only if it has "become distinctive of the applicant's goods in commerce," 15 U.S.C. § 1052(f), that is, in the unfortunate parlance of the cases, only if it has acquired "secondary meaning." Suggestive marks falling between the merely descriptive and the arbitrary or fanciful, are entitled to registration without proof of secondary meaning, as are fully arbitrary or fanciful terms. (citation omitted). The boundaries between these categories are not fixed.

*Id.*

Plaintiffs contend that the ECOTRIN mark is a coined, fanciful term and, as such, is a strong trademark entitled to the greatest protection the law can afford. Defendants contend that the ECOTRIN mark is merely descriptive as the term was derived from the descriptive words, "*e* nteric *co* at ed aspi*rin*," and consequently entitled to only minimal protection.

Fanciful terms are terms that were invented for the product, in other words, terms that are totally unknown in the language which were invented specifically for trademark purposes; for example KODAK is a fanciful term. *See* J. McCarthy, Trademarks and Unfair Competition, § 11:3, p. 436 (2d ed. 1984); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 n. 12 (2d Cir.1976). It is clear that the ECOTRIN suffix "RIN" is descriptive of aspirin and is used to identify aspirin as an ingredient in many brands of analgesics.[12] As the mark ECOTRIN describes the fact that it contains aspirin, it is not a fanciful mark. To be classified as a descriptive mark, however, the mark when viewed as a whole must "[convey] an immediate idea of the ingredients, qualities or characteristics of the goods." *Stix Products, Inc. v. United Merchants and Manufacturers Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968). It is unlikely that the average consumer when first presented with the ECOTRIN mark would comprehend that the mark is a derivative of "enteric coated aspirin." Indeed, it would take some imagination for the average consumer to ascertain what kind of a product ECOTRIN is.

A suggestive mark is one that "requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Id.* If our average consumer were to think about the ECOTRIN mark and use some imagination in considering it, the fact that it is an enteric coated aspirin product may come to mind. In any event, upon reflection the consumer could probably conclude that the product was an analgesic of some sort.

The line between descriptive marks and suggestive ones is often difficult to draw. As one commentator stated:

> "IN" suffix to denote aspirin as an ingredient, e.g. ANACIN and ASCRIPTIN.

---

12. Some examples of trademarks using the "RIN" suffix are EXCEDRIN, BUFFERIN, EMPIRIN, and COSPRIN. Other brands use an

The descriptive-suggestive borderline is hardly a clear one. Its exact location in any given situation is hazy and only subjectively definable. The descriptive category almost imperceptably shades over at its fringe into the suggestive domain. (footnote omitted).

J. McCarthy, Trademarks and Unfair Competition, § 11:21 p. 491 (2d ed. 1984).

After careful consideration, the Court finds that the ECOTRIN mark is suggestive and as such does not require any proof of secondary meaning. Placement on the continuum of distinctiveness, however, does not end the inquiry as to the strength of the mark; it is only the starting point. The strength of a trademark is determined not only by its distinctiveness in the abstract, but also its "distinctiveness, or its 'origin-indicating' quality in the eyes of the purchasing public." *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d at 1131. The Court, therefore, must consider the strength of the mark in the marketplace.

Defendants contend that ECOTRIN'S co-existence with other similar marks on similar products has weakened the distinctiveness of the ECOTRIN mark. Two well-known analgesics, EXCEDRIN and EMPIRIN, have the same first letter, the same number of syllables, and the same suffix as ECOTRIN. While it is true that evidence of third-party use of similar trademarks on similar products is relevant to show that the senior user's mark has been weakened, the burden is on the junior user to demonstrate that the third-party products are well-known to consumers. *Lever Brothers Co. v. American Bakeries Co.*, 693 F.2d 251, 256 (2d Cir.1982); J. McCarthy, Trademarks and Unfair Competition, § 11:26 p. 513–14 (2d ed. 1984). The Court finds that the marks EXCEDRIN and EMPIRIN are well-known to consumers and do compete with ECOTRIN for a share of the analgesic market. The co-existence of ECOTRIN with similar products that share the same characteristics that plaintiffs seek to enjoin, namely a three-syl-

lable word beginning with "E" and ending with "RIN", has had some diluting effect on the ECOTRIN trademark. The Court finds that it has a diluting effect because the co-existence of the three similar brands has sensitized the public to distinguish between such similar brands.

The purpose of a defendant introducing third-party uses is to show that customers have become so conditioned by a plethora of such similar marks that customers 'have been educated to distinguish between different [such] marks on the basis of minute distinctions.' (footnote omitted).

J. McCarthy, Trademarks and Unfair Competition, § 11:26 at 513–14 (2d ed. 1984).

It is evident that in the marketplace consumers are already faced with a choice among ECOTRIN, EXCEDRIN, and EMPIRIN, and they are apparently able to distinguish among those three marks. The same consumers should be able to distinguish a fourth mark, ENCAPRIN. In the Court's opinion, ENCAPRIN is no more confusing to the consumer than these other marks.

Also relevant in determining the strength of the mark in the marketplace are the results of any surveys conducted to determine the name recognition of the product. Studies conducted by Menley & James in 1982 indicate that consumer awareness of the ECOTRIN brand name is low.

Awareness of Ecotrin is low. Almost half of the respondents have no awareness of Ecotrin. Some respondents believe it is a relatively new product and most are unable to recall seeing it on the drugstore shelf or in advertising. Those who recognize the name Ecotrin are unsure what the product is and those who do remember advertising may be aware it is for arthritis but are unable to provide more details about it.

Only two arthritics correctly describe Ecotrin.

Defendants' Exhibit No. BV, p. 26.[13]

Ecotrin's continued inability to generate unaided awareness again places it at the

---

**13.** The methodology used in conducting this survey involved three interviewers conducting

bottom of the list at 10%. The mean for all brands [of analgesics] examined was 24%.

Defendants' Exhibit No. AD, p. 971.[14]

Although there was proof offered by plaintiffs that material advertising for ECOTRIN commenced in 1982 and continued to date, an increase in consumer awareness was not conclusively established to the Court's satisfaction.[15]

Although ECOTRIN is a suggestive mark entitled to protection without proof of secondary meaning, the Court finds that the mark has been diluted somewhat by its co-existence with EXCEDRIN and EMPIRIN and that consumer awareness of the ECOTRIN mark is low. Accordingly, the Court concludes that on the continuum of trademark strength and weakness, ECOTRIN is a relatively weak mark.

### (2) *Similarity of the Marks*

As with other areas of trademark law, determining the similarity between the two marks requires an examination of a number of factors. The Court must consider the totality of the circumstances and assess the mark as it is presented to the consumer in the marketplace. Included in the Court's analysis should be a consideration of the visual similarity, the phonetic similarity, and the similarity of the trade dress of the two marks.

### (a) *Visual Similarity*

Plaintiffs contend that the two marks are visually similar in that each is a three-syllable word which begins with a capital "E", each has a "C" at the beginning of the second syllable, and each ends with "RIN". The marks contain approximately the same number of letters and are printed on the products using similar typestyles starting with a capital "E" followed by lower case Roman letters.

■ Although as a general rule a Court should not dissect a trademark and consider its component parts, when a portion of a trademark is a common or generic term, the Court may consider the common element separately from the unique portion of the trademark. *See Upjohn Co. v. Schwartz*, 246 F.2d 254, 262 (2d Cir.1957); J. McCarthy, Trademarks and Unfair Competition, § 23:15(F) n. 15; 23:15(G) p. 87–90 (2d ed. 1984). The "RIN" ending contained in both ECOTRIN and ENCAPRIN is a derivative of the generic term "aspirin" and as such cannot be the basis for a likelihood of confusion. If the rule were otherwise, the first user of the generic suffix could enjoin all junior users. Clearly, this is not the case as the majority of over-the-counter analgesics end in "RIN" or "IN". When the common element of two trademarks is a generic term, the likelihood of confusion is reduced, as the public has come to expect that element on different products. J. McCarthy, Trademarks and Unfair Competition, § 23:15(F) p. 88 (2d ed. 1984).

In comparing the remaining prefixes, ECOT and ENCAP, the Court finds that there is no more likelihood of confusion between them than there is between ECOT and the prefixes on other well-known analgesics on the market, for example, the EXCED prefix from EXCEDRIN and the EMPI prefix from EMPIRIN. No evidence was presented that the average consumer could not differentiate between ECOTRIN and ENCAPRIN simply on the basis of their appearance.

Regarding the plaintiffs' contention that the typestyle displayed on the packaging of

in-depth interviews over two days with the participants. Thirty participants were involved; all participants had arthritis for which they used a nonprescription pain relief medication.

**14.** The methodology used in conducting this survey involved 2444 telephone interviews with arthritics who were also self-medicators. The participants were recruited by a random telephone search.

**15.** Plaintiffs contend that 55% of arthritis self-medicators know the ECOTRIN product by its trademark. In support of this contention the plaintiffs rely on the affidavit of their expert witness, Mr. David Abrams. The plaintiffs, however, have not cited any surveys or studies which demonstrate what the consumer awareness of ECOTRIN is.

the two marks is "virtually identical", the Court finds that the typestyle of the two marks is somewhat similar, but not likely to cause confusion to consumers. A number of analgesic marks, including EXCEDRIN, are displayed on their packaging using a capital letter followed by lower case Roman letters. There is nothing particularly unique about ECOTRIN'S lettering. Additionally, in comparing ECOTRIN'S typestyle with ENCAPRIN'S typestyle, the Court notes that the ECOTRIN lettering is much broader and takes up a greater percentage of the package face that the taller and more slender ENCAPRIN letters do.

The Court is well-aware that the average consumer does not normally scrutinize trademarks with exactitude. The Court sets forth its observations concerning the prefixes and lettering as support for its view that, considering the total appearance of the two marks, the average consumer is not likely to be confused by them. The Court finds that the marks are sufficiently different in appearance to preclude any likelihood of confusion.

### (b) *Phonetic Similarity*

Defendants contend that the proper pronunciation of their ENCAPRIN product is n-CAP-rin with the accent on the second syllable. Plaintiffs contend that consumers are just as likely to pronounce the mark EN-cuh-prin with the accent on the first syllable. ECOTRIN is pronounced EK-o-trin with the accent on the first syllable. Plaintiffs contend that consumer mis-

pronunciation of ENCAPRIN will lead to confusion between the two marks.[16] As a preliminary matter, the Court notes that there is no proper way to pronounce a trademark. Arguments by a junior user that his trademark, if properly pronounced, would not infringe on the senior user's mark are without merit. The inquiry is not what the correct pronunciation is, but what the usual pronunciation by the ordinary consumer is. *Lebow Brothers, Inc. v. Lebole Euroconf S.p.A.*, 503 F.Supp. 209, 212 (E.D.Pa.1980); J. McCarthy, Trademarks and Unfair Competition, § 23:5 p. 59 (2d ed. 1984).

The evidence presented to this Court on the issue of phonetic similarity leaves much to be desired. The plaintiffs rely primarily on a composite videotape of consumers in the Tucson, Arizona ENCAPRIN test market discussing various analgesic products.[17] No linguist or other language specialist was called to testify about what the likely pronunciation of ENCAPRIN would be.

The composite tape of the focus groups does show several instances of mispronunciation of the ENCAPRIN trademark by consumers, but the Court has serious reservations about relying on this tape as proof of confusion as to the source of the products on the part of an appreciable number of ordinarily prudent purchasers. First, mispronunciation of the trademark does not necessarily indicate that the consumers were confused about the two products. All of the consumers at the focus groups were

---

**16.** Even though there is no "correct" way to pronounce a trademark, this Court will refer to the correct pronunciation of ENCAPRIN as n-CAP-rin and the mispronunciation as EN-cuh-prin for the purpose of the decision.

Plaintiffs contend that even if the ENCAPRIN mark is properly pronounced, that is, pronounced the way P & G intended it to be, the mark infringes their trademark. This Court does not agree with this contention. If the ENCAPRIN mark is properly pronounced, this Court finds that there is no likelihood of confusion resulting from phonetic similarity.

**17.** The focus group tapes were prepared by P & G for their own use. The full tapes consist of nine or ten hours of videotapes showing consumers from the Tucson, Arizona area discuss-

ing various analgesics. The participants were recruited via telephone and were paid $15.00 each for their participation in the group. At each focus group there was a group leader who directed the discussion and asked questions.

The purpose of a focus group is to stimulate expressions of feelings and thoughts about a product so that experienced observers can evaluate any potential problems with a new product. The participants sit around a large table and discuss their likes and dislikes about various products on the market.

In addition to the full tapes, the plaintiffs introduced into evidence a 22-minute composite tape made from bits and pieces from the full tapes. This twenty-two minute tape purported to demonstrate instances of consumer confusion between ECOTRIN and ENCAPRIN.

aware that there were two separate products, namely ECOTRIN and ENCAPRIN. Second, the responses consumers gave concerning the two names [18] were prompted by the group leader in a suggestive context; in other words their attention was focused on ECOTRIN and ENCAPRIN in an artificial environment that was not at all like the environment of the marketplace. There was no evidence that any consumer went into the marketplace looking for ECOTRIN and purchased ENCAPRIN by mistake. The tape merely demonstrated that consumers had a hard time pronouncing the ENCAPRIN mark. Third, there was evidence presented to the Court that the recruiter who initially telephoned the focus group participants pronounced the ENCAPRIN mark as EN-cuh-prin. Common sense suggests that this initial mispronunciation of the mark would have a significant effect on how consumers subsequently pronounced it. Finally, even the plaintiffs admit that the results of a focus group cannot be generalized to the population as a whole. Even if the Court concluded that the focus group somehow recreated the atmosphere of the marketplace, which it clearly does not, and was not tainted by the initial mispronunciation of the mark by the recruiter, any results obtained would be particular to that focus group and could not be used to predict the behavior of consumers as a whole. The focus group evidence, therefore, is only marginally probative of whether an appreciable number of ordinarily prudent purchasers are likely to be confused.

The only other evidence on the likelihood of confusion based on phonetic similarities consists of memoranda prepared by P & G employees who observed the focus groups and reduced their observations to writing and a memorandum from the defendants' advertising agency stating that the agency needed to minimize confusion between the new ENCAPRIN product name and the ECOTRIN name.

The memoranda concerning the focus groups suffer from the same infirmities as the focus group tapes. The memorandum from the defendants' ad agency merely sets forth the agency's opinion that it needed to work on minimizing any confusion that might result from a comparison of the two names. There is no question that P & G was, and is, attempting to compete directly with ECOTRIN. Proof that the defendants' advertising agency sought to minimize any confusion between the two names does not demonstrate that an appreciable number of ordinarily prudent purchasers would be confused by them; it merely demonstrates that the agency wanted to make P & G's product as distinctive as possible.[19]

While the Court agrees that there may be instances of mispronunciation of the ENCAPRIN mark, mispronunciation standing alone does not demonstrate consumer confusion. Plaintiffs must also demonstrate that mispronunciation is prevalent and will lead to consumer confusion because the mispronunciation of ENCAPRIN is phonetically similar to ECOTRIN.

---

18. Some examples of consumer comments are:

I have only one suggestion, is the name. You notice some—just about everybody here's had some trouble pronouncing it. It is a very hard name to pronounce and, because of that, you might remember it. But it is hard to pronounce.
I didn't find anything wrong with the name. It's not a—it's not a catchy name, per se. You know, there's things like aspirin, of course, is pretty common maybe because it just hasn't been on the market long enough . . . .
What is the correct pronunciation of the—I mean, even a second girl called me not knowing someone else had called me and she

had—I don't know who she was, but she had the hardest time pronouncing the name. She kept saying EN-ca-prin and EN-co-prin. I mean, I was embarrassed for her because I felt she was really representing the company. All of these comments were made in response to questions. Plaintiffs' Exhibit No. 31 AT.

19. The memorandum from the defendants' advertising agency, in discussing advertising also stated:

[T]here is every reason to believe that [ENCAPRIN] will be seen as different from Ecotrin.
Plaintiffs' Exhibit No. 1.

The plaintiffs have not put forth sufficient evidence that consumers are more likely to mispronounce ENCAPRIN than they are to pronounce it correctly—in fact, the Court has no evidence before it demonstrating what percentage of consumers would be likely to mispronounce it. Plaintiffs are requesting that the Court speculate as to how many such consumers there might be, but in the absence of survey proof on this point or proof of actual confusion, the Court must compare the two marks for its determination of the degree of phonetic similarity. The Court finds that the plaintiffs have not demonstrated that an appreciable number of consumers will be confused by phonetic similarities between ECOTRIN and ENCAPRIN.

### (c) *Similarity of Trade Dress*

In evaluating questions of trademark infringement, the Court must consider the "total picture" presented to the consumer, that is, the sum total of the separate factors analyzed by the Court. In evaluating this total picture, one important factor is the context in which the mark is presented. As one commentator stated:

> While a given mark may be an infringement when used as a part of one total assemblage of trade dress, it may not be an infringement when used in a different context of label design, package, lettering style, etc. (footnote omitted) ... In an infringement case, the defendant's background trade dress may be sufficient to distinguish the goods even though in the abstract, the marks might be said to be confusingly similar.

J. McCarthy, Trademarks and Unfair Competition, § 23:18, p. 100–101 (2d ed. 1984). That is not to say that a junior user may adopt a trademark confusingly similar to that of a competitor and then avoid liability by designing a different trade dress; rather, it is a reminder that trademarks are only part of a package and it is the whole package that the consumer in the marketplace must evaluate. *See Lever Brothers Co. v. American Bakeries Co.*, 693 F.2d at 257.

The parties here agree that there is no similarity in the trade dress of ECOTRIN and ENCAPRIN. Defendants contend that this difference in trade dress is particularly important here because of the emphasis that ECOTRIN'S advertising has placed on the color orange. All ECOTRIN packaging features the color orange.

The ECOTRIN boxes all feature the word "ECOTRIN" prominently displayed in bold black letters. The dot over the "I" in ECOTRIN is a representation of an orange tablet or an orange capsule, undoubtedly to illustrate the dosage form contained inside the package. The regular strength ECOTRIN boxes are white and orange; the maximum strength boxes are yellow and orange. Also contained on the front panel are the words "safety coated aspirin" directly below the word ECOTRIN and the words "for arthritis pain" on the lower panel to the right center. Each box indicates the number of tablets or capsules contained in the package and the number of milligrams in each tablet or capsule.

The ENCAPRIN boxes all feature the word "ENCAPRIN" prominently displayed in slim white letters on a dark navy blue background. Each box also displays a representative white capsule with white micrograins inside it. The regular strength ENCAPRIN has a bold green stripe underscoring the word ENCAPRIN; the maximum strength ENCAPRIN has a bold blue stripe underscoring the word ENCAPRIN. The Norwich Eaton logo, a white NE on a bright red square background, is prominently displayed in the uppermost left corner of the package followed by the words "Norwich Eaton Pharmaceuticals" in white letters. Each box indicates the number of capsules and the strength of each capsule. The words "Arthritis Pain Reliever" are displayed just below the word ENCAPRIN.

In the Court's view the trade dress of the two products is totally dissimilar. The plaintiffs' ECOTRIN product displays the color orange on all of its boxes and clearly displays an orange capsule or tablet on each box. The color scheme for its boxes utilizes "hot" colors such as yellow and orange in contrast to the "cool" blues and greens used on ENCAPRIN boxes. Additionally, the ENCAPRIN boxes clearly display the Norwich Eaton name and logo.

Smithkline acknowledges that all of the advertising for ECOTRIN emphasizes the orange color of the tablet or capsule and advises consumers to look for the color orange when purchasing ECOTRIN. Smithkline correctly points out that a side-by-side comparison of products is not the standard by which trademark infringement is measured and argues that all consumers cannot stand in the marketplace and compare a box of ECOTRIN to a box of EN-CAPRIN. While this may be true of products that are sold in different sections of a store or, indeed, in totally different markets, this argument has less weight when it is clear that the products will be sold side-by-side in the marketplace. Ample evidence was presented at trial regarding the shelving of analgesic products for the Court to conclude that in the vast majority of instances, ECOTRIN and ENCAPRIN will be sold in the same section of the marketplace.

Plaintiffs also argue that not all consumers are aware that ECOTRIN is associated with the color orange and that a word-of-mouth recommendation to purchase ECOTRIN could result in a confused consumer purchasing ENCAPRIN by mistake. The Court finds no evidence in support of this contention. The names of the products are prominently displayed on totally dissimilar boxes and shelved in the same section of the supermarket or drugstore along with a myriad of other analgesics. If the consumer was unaware that ECOTRIN was associated with the color orange and the consumer could not recall the name of the recommended product, the consumer would be just as likely to pick up a package of EXCEDRIN or EMPIRIN as ENCAPRIN.

Finally, plaintiffs argue that the defendants are under no legal obligation to keep their trade dress different from ECOTRIN'S. While it is true that no one has ordered P & G to keep its packaging distinct from Smithkline's, P & G's potential future packaging is not at issue in this lawsuit. Currently, the trade dress of EN-CAPRIN is totally different from the trade dress of ECOTRIN, and the Court finds that this dissimilarity tends to dilute any likelihood of consumer confusion.

In evaluating the visual, phonetic, and trade dress similarity of the two marks, the Court concludes that the marks are not sufficiently similar to cause a likelihood of confusion among customers.

### (3) *Similarity of the Products*

ECOTRIN and ENCAPRIN are very similar products. ECOTRIN is an enteric coated aspirin product. Until 1983, ECOTRIN was only available in tablet form, but in late 1983, ECOTRIN introduced an encapsulated aspirin product. Both the capsule and the tablet are available in two strengths, 325 mg. and 500 mg. ENCAPRIN is also an enteric coated aspirin product. ENCAPRIN is only available in capsule form. The capsules are available in two strengths, 325 mg. and 500 mg. Each capsule contains enteric coated micrograins.

Plaintiffs have attempted to persuade the Court that both ECOTRIN and EN-CAPRIN are part of an arthritis specialty submarket and that therefore the relevant market for the two drugs is much smaller than the general analgesic market.[20] Plaintiffs' purpose in suggesting the existence of this submarket is apparently to demonstrate to the Court why ECOTRIN has been able to coexist with EXCEDRIN and EMPIRIN, products in the so-called general analgesic market, but cannot coexist with ENCAPRIN.[21]

---

**20.** Plaintiffs contend that the arthritis specialty submarket contains the following drugs: AS-CRIPTIN, ASCRIPTIN A/D, ARTHRITIS STRENGTH BUFFERIN, ARTHRITIS PAIN FORMULA, COSPRIN, ARTHRITIS BAYER, ECOTRIN, and ENCAPRIN.

Plaintiffs contend that the general analgesic market contains the following drugs: NOR-WICH ASPIRIN, BAYER, ANACIN, EMPIRIN, EXCEDRIN, BUFFERIN, ANACIN–3, and TYL-ENOL.

**21.** Indeed, the Vice President of Marketing of Menley & James, Mr. Victor Galef, testified that plaintiffs would not consider the ENCAPRIN mark an infringement if it were used on a general analgesic. [TR 1097]. Additionally, Mr. James R. Meyer, Smithkline's trademark attorney, informed Mr. John J. Cummins, P &

While the existence of an arthritis specialty submarket may be important for advertising or other marketing purposes, the Court fails to see its relevance in this trademark infringement case. There is no doubt that ECOTRIN and ENCAPRIN are very similar products in direct competition with each other, but there is also no doubt that ECOTRIN and ENCAPRIN are also in direct competition with the so-called general analgesics. It is uncontroverted that the brands of analgesics most widely used for relief of arthritis pain are TYLENOL, BUFFERIN, BAYER, and ANACIN. All four of these drugs are considered general analgesics. Indeed, more arthritics take EXCEDRIN for their arthritis pain than take ECOTRIN.[22]

It is extremely doubtful that the average consumer considers the existence of an arthritis specialty submarket when he or she goes shopping for pain medication. What the consumer is presented with is a vast array of pain medications all shelved together in the supermarket or drug store. The consumer is presented with the opportunity to choose from among all of these medications, not just the arthritis specialty medications. The fact that the vast majority of arthritics medicate with general analgesics indicates that the market cannot be roped off into discrete markets as plaintiffs suggest.

The Court finds that ECOTRIN and ENCAPRIN are both enteric coated aspirin products and as such are in direct competition with each other and with other analgesics.

### (4) Evidence of actual confusion

Plaintiffs contend that they have shown the Court several instances of actual confusion between ECOTRIN and ENCAPRIN. Plaintiffs again rely on the focus tapes as evidence of actual confusion. The Court has already outlined the unreliability of the focus tapes and declines to rely on them as proof of actual confusion.[23] Of course, the plaintiffs do not have to prove any instances of actual confusion to prevail on their claims of trademark infringement and unfair competition. *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 761 (2d Cir.1960); J. McCarthy, Trademarks and Unfair Competition, § 23:2(A), p. 50 (2d ed. 1984). Even though there is no evidence of actual confusion, the Court has not given great weight to its absence because the ENCAPRIN product has not been on the market long enough for the absence of actual confusion to be an indica-

G's trademark attorney, that plaintiffs would not have challenged the ENCAPRIN mark if it were used on a general analgesic product. TR of June 28, 1984 at 632–34, 639–40.

The Court finds this view rather curious. It appears to the Court that if the name ENCAPRIN infringes the mark ECOTRIN when used on an enteric coated aspirin, it would be just as likely to infringe if on plain aspirin or acetaminophen. The test is whether the two names are likely to confuse the average consumer. The Court notes that no where on the ENCAPRIN box does it state that ENCAPRIN is enteric coated; it merely states that ENCAPRIN is arthritis medication. A consumer is presented with a vast array of analgesics in the marketplace and normally all the analgesics are shelved together. The Court does not agree with the plaintiffs that the fine market gradations of submarkets are cognizable to the average consumer.

**22.** *See* Defendants' Exhibit No. BJ, "A Gallup Study of Attitudes Toward and Use of Anti-Arthritic Medicines"

Individuals who purchase pain medication for arthritis comprise 25% of the total analgesic market. Of this 25% only 6% buy analgesics from the so-called arthritis specialty submarket. The remaining 19% buy analgesics from the general analgesic market.

TR. of June 21, 1984 at 1142; Plaintiffs' Exhibit No. 66.

**23.** Plaintiffs rely most heavily on a comment by one woman who is asked if she has seen an ENCAPRIN commercial. She replies that she has and that the star of "Little Acres" is their spokesperson. This is apparently a reference to Eddie Albert, the star of the television series, "Green Acres." Mr. Albert is the spokesperson for ECOTRIN. Plaintiffs contend that this demonstrates actual confusion.

The woman's comment took place during general discussion of both the ECOTRIN and ENCAPRIN products and the Court finds that under the circumstances that prevailed at the focus groups, i.e. freewheeling general discussions of a number of brands, the woman's comment cannot be credited as proof of actual confusion.

tor. *Cf. Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d at 1006.

### (5) *Good Faith*

The parties are in agreement that P & G did not adopt its ENCAPRIN mark to trade on the goodwill of Smithkline's product. Prior to adopting the ENCAPRIN mark, P & G conducted trademark searches which did not disclose the ECOTRIN mark. The name ENCAPRIN was selected to suggest to consumers that the product was "encapsulated aspirin." A follow-up trademark search was done in July, 1983. It also did not disclose the ECOTRIN mark, and the legal department of P & G cleared the ENCAPRIN trademark for use. P & G applied to the Trademark Office to have the mark registered. The mark was registered without a rejection by the Trademark Examiner, and no notices of opposition were filed before the end of the opposition period. The final registration was issued in May, 1984.

There is no proof that P & G intended to "ride" on ECOTRIN'S success. *Cf. Mushroom Makers, Inc. v. R.G. Barry Corp.*, 441 F.Supp. 1220, 1229–30 (S.D.N.Y.1977). All the evidence presented to the Court demonstrates that P & G is just as anxious to have its product be distinguishable from Smithkline's as Smithkline is to have its product distinguishable from P & G's. The question remaining for the Court is whether the products are sufficiently distinguishable to avoid a likelihood of consumer confusion. The Court finds that there is no evidence of bad faith in P & G's decision to adopt the ENCAPRIN mark.

### (6) *Quality of P & G's ENCAPRIN Product*

Plaintiffs have not questioned the quality of P & G's ENCAPRIN product and there is no evidence before the Court suggesting that ENCAPRIN is any less safe or effective than ECOTRIN is. The importance of this factor is minimal when the goods involved are essentially the same product as they are here. Nevertheless, the Court finds that there is no difference in quality between ECOTRIN and ENCAPRIN.

### (7) *Sophistication of the Buyers*

It is difficult for the Court to stand in the shoes of the ordinary, average consumer. When out shopping, is the average consumer reasonably careful or "hasty, heedless and easily deceived?" *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. at 494. One court in considering this dilemma stated:

> The law is not made for the protection of experts, but for the public—that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions.

*Florence Manufacturing Co. v. J.C. Dowd & Co.*, 178 F. 73, 75 (2d Cir.1910).

After examining the cases in this area, the Court concludes that the standard that should be utilized is similar to the reasonable person standard utilized in the law of negligence. The average consumer should be expected to exercise that degree of care that a reasonably prudent purchaser would exercise under the circumstances. For example, consumers can normally be expected to exercise more care when they are purchasing an expensive item such as an automobile than they do when they are purchasing a relatively inexpensive item, such as paper towels.

Some evidence was presented to the Court that consumers tend to be more careful in making selections of medications than they are when making other product selections. Two witnesses testified that consumers take a long time to select medications and tend to read the labels carefully. The witnesses attributed this tendency to the recent "TYLENOL scare." TR of June 22, 1984 at 105. Whatever the reason may be, the Court agrees that a reasonably prudent purchaser would be somewhat more careful when purchasing over-the-counter medications than when purchasing other houseware or grocery items. Most consumers are aware that medications can be dangerous if taken incorrectly and would, therefore, be reasonably careful when purchasing them.

Plaintiffs argue that a large percentage of people with arthritis are elderly and, therefore, may have an impairment of eyesight or hearing which could affect their ability to differentiate between products in the marketplace. As ECOTRIN and ENCAPRIN are both products which appeal to the arthritis sufferer, plaintiffs contend that this disproportionate number of elderly customers leads to an increased likelihood of confusion in the marketplace. In response to this contention, the defendants presented an expert on aging who testified that older persons tend to compensate for their declining faculties and are particularly careful in selecting over-the-counter medications. The Court agrees with the defendants that there is no evidence that individuals over 50 are more likely to be confused by the marks ECOTRIN and ENCAPRIN than the average customer.

The Court finds that the average purchaser of over-the-counter medications tends to be reasonably careful when making such purchases.

### (8) Senior User's Delay in Asserting its Claim

P & G contends that Smithkline's claims should be barred by laches because Smithkline delayed in asserting its claim that ENCAPRIN infringed the ECOTRIN trademark. P & G bases this contention on the fact that Smithkline received the September, 1983 Trademark Alert, which listed the notice of the filing of an application to register the ENCAPRIN mark, but did not send its letter protesting the use of the ENCAPRIN mark until April, 1984.

The September, 1983 issue of Trademark Alert arrived at Smithkline shortly after Smithkline's trademark counsel, Mr. James Meyer, suffered a broken leg. It was Mr. Meyer's responsibility to review the Trademark Alert for any trademarks that might infringe on Smithkline's trademarks. Mr. Meyer testified that he did not recall seeing the September, 1983 issue of Trademark Alert. He also testified that he was out of the office around that time due to his broken leg.

In support of its laches argument, P & G also cites the fact that the January, 1984 issue of the Smithkline "Sales Line", a publication for Smithkline employees, reported a rumor that P & G was marketing an aspirin product called ENCAPRIN in the Phoenix, Arizona area. Smithkline's attempt to locate the product was unsuccessful as the actual test market was in Tucson, Arizona.

It was not until March, 1984 that the ENCAPRIN product finally came to the attention of Smithkline's management. Shortly thereafter, on April 2, 1984, Smithkline sent a protest letter to P & G.[24] P & G responded to Smithkline's protest on April 17, 1984, stating that it saw no infringement.[25] The present action was filed on May 10, 1984, only three weeks after the P & G response to Smithkline's protest letter and two months after Smithkline's management first learned that the ENCAPRIN product was on the market.

It is this Court's view that under the circumstances of this case, the relief sought by Smithkline is not barred by laches or estoppel. Cf. G.D. Searle & Co. v. Charles Pfizer & Co., 265 F.2d 385, 389 (7th Cir.), cert. denied, 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65 (1959); McNeil Laboratories v. American Home Products Corp., 416 F.Supp. 804, 809 (D.N.J.1976). Upon learning of the existence of the ENCAPRIN product, Smithkline's management promptly protested the use of the ENCAPRIN mark. When P & G indicated that it would not discontinue use of the mark, Smithkline filed the instant action within three weeks. Smithkline acted promptly to preserve its rights. This is not a situation in which the doctrine of laches should apply.

### Conclusion—No Likelihood of Confusion

As previously stated, the Court's task in deciding the issue of likelihood of confusion is to determine whether an ap-

---

**24.** See supra note 3.

**25.** See supra note 4.

preciable number of reasonably prudent consumers would be likely to be confused by similarities between the mark ECOTRIN and the mark ENCAPRIN. The task has been a difficult one, but after carefully considering all the relevant factors, the Court concludes that the plaintiffs have not met their burden of proving consumers are likely to be confused.

Although the plaintiffs have shown that the mark ECOTRIN is worthy of protection, and that the two products are very similar, plaintiffs have failed to convince the Court that the marks are sufficiently similar to cause confusion.

## II. *The Equities*

The plaintiffs have failed to demonstrate success on the merits and, therefore, it is not necessary for the Court to balance the equities. *Sierra Club v. Alexander,* 484 F.Supp. at 471; *Lever Brothers Co. v. American Bakeries Co.,* 693 F.2d at 255 n. 6. Nevertheless, the Court feels constrained to comment on the extreme economic hardship that would befall the defendants if an injunction were to issue.

P & G has already made a substantial investment in their ENCAPRIN product. P & G has built a special plant in Norwich, New York to manufacture ENCAPRIN. More than $12,000,000 worth of ENCAPRIN has already been produced and shipped to store shelves. Defendants have already committed themselves to millions of dollars worth of advertising for ENCAPRIN.[26]

Additionally, defendants would suffer substantial harm to their reputation if a recall of the drug was ordered. The ENCAPRIN product has already been detailed to over 1,000 leading doctors throughout the country and presented to various professional groups. ENCAPRIN is now being advertised nationally and is on the shelf in most cities throughout the country. To order P & G to recall the drug and enjoin them from further production would result

in a loss to P & G in excess of $20 million dollars.

In contrast, the damage to the plaintiffs is purely speculative. Plaintiffs put in no proof of actual damages at trial. Smithkline argues that P & G should not have forged ahead with its national product launch knowing that there was the distinct possibility that they would be enjoined. Smithkline contends that P & G is merely "building up" its damages so that the equities will weigh in its favor.

 P & G argues, and the Court agrees, that to stop its national launch would have been tantamount to accepting an injunction without a hearing. P & G already had advance orders for ENCAPRIN and it felt compelled to fill those orders. Plans for the launch were already in place. In view of the fact that most of the large expenditures for ENCAPRIN had already been made prior to the national launch, it was not unreasonable for P & G to proceed with it. The Court finds that the balance of equities weighs heavily in favor of the defendants.

## III. *The Dilution Claim*

Plaintiffs also argue that the New York General Business Law § 368–d protects the ECOTRIN name from dilution by ENCAPRIN. The New York anti-dilution statute was passed to protect famous trademarks from use by others on non-competing goods—hence a "diluting" as distinct from a "confusing" use. Examples of diluting trademarks include: Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, and Bulova gowns. *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983).

 Section 368–d is inapposite here for a number of reasons. First, the statute does not apply where the products involved are similar and competitive. *Playboy Enterprises, Inc. v. Chuckleberry Publish-*

---

26. P & G submitted its advertising budget for ENCAPRIN to the Court for its *in camera* review. The planned expenditures are substantial.

Court Exhibit No. 1.

*ing, Inc.,* 486 F.Supp. 414, 418 n. 1 (S.D.N.Y.1980); J. McCarthy, Trademarks and Unfair Competition, § 24:13(C), p. 219 (2d ed. 1984) Clearly ECOTRIN and ENCAPRIN are similar and competitive products; therefore, § 368–d does not apply. Second, § 368–d only protects famous or very strong, highly distinctive marks. *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d at 625; *see also* J. McCarthy, Trademarks and Unfair Competition, 24:14(A), p. 224 (2d ed. 1984). ECOTRIN is a suggestive mark with low consumer brand awareness and does not qualify as a strong and highly distinctive mark.

The plaintiffs have not demonstrated that they have a viable cause of action under § 368–d and the Court, therefore, finds no dilution of the ECOTRIN mark by ENCAPRIN.

### CONCLUSION

To prevail on Counts I, II, III and IV of the complaint, which state causes of action for unfair competition, false designation of origin, trademark infringement, and cancellation of defendants' federally registered trademark respectively, plaintiffs must show that there is a likelihood of confusion between plaintiffs' ECOTRIN mark and defendants' ENCAPRIN mark; in other words Counts I–IV stand or fall together.

As the Court concludes that there is no likelihood of confusion between the marks, the plaintiffs have not met their burden regarding Counts I–IV. Additionally, the Court finds that the plaintiffs have not met their burden of demonstrating that their ECOTRIN mark is being diluted by defendants' ENCAPRIN mark under Section 368–d of New York's General Business Law as alleged in Count V.

Accordingly, judgment is hereby granted for the defendants on all counts and the clerk is directed to enter judgment in their favor pursuant to Fed.R.Civ.P. 58.

IT IS SO ORDERED.